| | |
|---|---|
| ROBERT A. MUSIALA. JR. IN HIS CAPACITY AS COURT APPOINTED RECEIVER FOR VIRGIL CAPITAL LLC, MONTGOMERY TECHNOLOGIES LLC, VIRGIL TECHNOLOGIES LLC, VIRGIL QUANTITATIVE RESEARCH LLC and VQR PARTNERS LLC<br><br>                         Plaintiff,<br>     v.<br><br>VATSAL DOSHI, JOSHUA GIBSON, JASVEER GREWAL, CHIRAG PARGHI, JAY PATEL, TRUSTEE FOR KARTIK PATEL REVOCABLE LIVING TRUST, RAJ PATEL, RP FAMILY HOLDINGS LLC, SACHIN PATEL, SAMIR R. PATEL, and VARUN VERMA<br><br>                   Defendants. | **Civil Action No. 1:25-CV-00638** |

## COMPLAINT

Robert A. Musiala, Jr. in his capacity as the Court appointed receiver ("Receiver") for Virgil Capital LLC ("Virgil Capital"), Montgomery Technologies LLC, Virgil Technologies LLC, Virgil Quantitative Research LLC, and VQR Partners LLC, including without limitation the assets of Virgil Sigma Fund, LP ("Sigma Fund") and VQR Multistrategy Fund, LP ("VQR Fund") (collectively, "Receivership Entities"), in the action captioned *SEC v. Stefan Qin et al.* 20-cv-10849 (JGLC) ("SEC Action") by and through his undersigned counsel, for his complaint ("Complaint") alleges the following:

### NATURE OF THE PROCEEDING AND BACKGROUND

1.      The Receiver is empowered to seek to set aside and recover fraudulently conveyed assets that Stefan Qin ("Qin") misappropriated from the Receivership Entities. From June 2017 to December 2020, using his ownership and control of the Receivership Entities, including the assets

of Sigma Fund, Qin caused the Receivership Entities to engage in a fraudulent scheme to, *inter alia*, lure investors into Sigma Fund, a purported investment fund that he falsely claimed used algorithmic trading strategies to take advantage of arbitrage opportunities within the cryptocurrency market.

2. In reality, Sigma Fund was operated as a Ponzi scheme. It did not conduct arbitrage or other trading activity on behalf of or for the benefit of its investors, and its only material source of revenue was the continuous deposit of cash from investors. The Court in the SEC Action ruled explicitly on December 20, 2024 that "Qin operated a Ponzi scheme using [the Sigma Fund and the VQR Fund] and commingled assets between them."

3. As Sigma Fund conducted no trading, it generated no profits for its investors and earned no performance fees for its investment manager. Despite this, and to conceal his fraudulent scheme, Qin issued fabricated account statements showing fictitious profits purportedly earned by Sigma Fund investors in their respective accounts. When Sigma Fund investors sought to redeem their profits or collect "performance fee rebates," Qin paid these investors using cash invested by new or existing Sigma Fund investors.

4. On February 4, 2021, in connection with this fraudulent scheme, Qin pled guilty to one count of securities fraud, and to a criminal information that set forth facts, including that Qin continuously falsified the performance of Sigma Fund, sent account statements to current investors reflecting significant but fabricated gains, concealed Sigma Fund's true state from investors, and used newly acquired Sigma Fund investor deposits to pay older Sigma Fund investor redemptions. *United States v. Qin*, 21-CR-75 (VEC) (S.D.N.Y.). Qin is currently serving a ninety-month prison sentence.

5.     Since his appointment on January 21, 2021, and in execution of his duties under the Order Appointing Receiver (SEC Action ECF No. 31) ("Receiver Order"), the Receiver has been engaged in an ongoing effort to locate, marshal, and preserve assets misappropriated by Qin that belong to the Receivership Entities. This process has included clawing back assets that Qin fraudulently conveyed to investors in Sigma Fund under the guise of purported profit redemptions or purported performance fee rebates. These efforts are critical for the eventual distribution of assets to defrauded investors of the Funds.

6.     On or about March 26, 2018, CV Virgil LLC ("CV Virgil") subscribed to Sigma Fund as a limited partner and invested certain cash assets of its members, which Sigma Fund purported to hold in an account in CV Virgil's name ("CV Sigma Account"). In reality, however, due to Qin's fraudulent scheme, the CV Sigma Account at Sigma Fund existed on paper only, and any gains reported to investors on monthly statements as profits or performance fee rebates were mere fabrications, born of Qin's imagination.

7.     CV Virgil was one of the Sigma Fund investors who were able to redeem their investments in full, plus fictitious profits, before Qin's fraudulent scheme was discovered and the SEC Action commenced. Purported redemptions and purported performance fee rebates that CV Virgil received were subsequently or initially transferred to Vatsal Doshi, Joshua Gibson, Jasveer Grewal, Chirag Parghi, Jay Patel, Trustee for Kartik Patel Revocable Living Trust, Raj Patel, RP Family Holdings LLC, Sachin Patel, Samir R. Patel, and Varun Verma (collectively, "Defendants") — prior to the dissolution and cancellation of CV Virgil in March 2020 by its member-manager.

8.     Between July 2018 and March 2020, Defendants received transfers either as initial transferees or as subsequent transferees of the initial transfers, in the aggregate amount of

$2,716,182.27 USD. Of that amount, approximately $1,286,186.69 USD represents fictitious profits and/or fictitious performance fee rebates that were never earned by CV Virgil.

9.    Because Sigma Fund conducted no trading, any purported gains or rebates transferred to the Defendants were not a result of actual investment activity. Instead, these conveyances consisted solely of cash previously deposited for purported investment by other Sigma Fund investors. As such, Defendants benefitted from Qin's Ponzi scheme, having received transfers of other Sigma Fund investors' money. These conveyances are fraudulent and must be set aside and returned to the Receivership Estates as set forth in the Receiver Order, for eventual distribution to the victims of Qin's fraud.

10.    This action is brought pursuant to the Receiver Order, the New York Fraudulent Conveyance Act (New York Debtor and Creditor Law ("DCL") § 270 *et seq*. (McKinney 2001)), 28 U.S.C. § 754, and other applicable law, to set aside and recover fraudulent conveyances of Receivership Property[1] to or for the benefit of Defendants. The Receiver seeks to recover the Receivership Property for eventual distribution to investors and creditors defrauded by Qin.

## JURISDICTION AND VENUE

11.    This is an action commenced in the same Court before which the underlying SEC Action is pending.

12.    The Court has jurisdiction over these proceedings pursuant to (i) Section 22 of the Securities Act of 1933 (15 U.S.C. § 77v), and (ii) Sections 21(e) and 27 of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78u(e) and 78aa).

13.    This Court has subject matter jurisdiction over this complaint pursuant to 28 U.S.C. § 754, 28 U.S.C. § 1367(a), 28 U.S.C. § 1692, and the Receiver Order, as this is an action brought

---

[1] Capitalized terms not expressly defined herein take the meaning ascribed to them in the Receiver Order.

by the Receiver appointed by this Court concerning property under this Court's exclusive jurisdiction.

14. This Court has personal jurisdiction over the Defendants pursuant to, *inter alia*, 15 U.S.C. § 78aa, and Federal Rule of Civil Procedure 4(k).

15. Qin is an Australian national and a New York resident currently located at a federal correctional institution in New Jersey, and at all relevant times operated the Receivership Entities from the State of New York and other locations.

16. The Defendants are subject to personal jurisdiction because they purposely availed themselves of the laws and protections of the United States and the State of New York by, among other things, utilizing a New York bank account to receive redemptions of their Sigma Fund investments, all of which constituted Receivership Property.

17. Defendants invested in Sigma Fund through CV Virgil, which at all relevant times maintained a business address in Brooklyn, New York, and whose member-manager, Defendant Raj Patel, shared that same address.

18. In March 2018, CV Virgil became a limited partner in Sigma Fund. In connection with the limited partnership, Raj Patel, on behalf of CV Virgil, signed subscription documents and executed a side letter (collectively, "Account Agreements") on various dates in March 2018 in New York.

19. By directing their Sigma Fund investments through CV Virgil, a Delaware entity that maintained a business address in Brooklyn, New York, Defendants knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York.

20. In addition, CV Virgil maintained a bank account ending in 1073 at a Brooklyn-based Chase, N.A. branch ("CV Chase Account"). The CV Chase Account received cash from the individual Defendants and transferred that cash to Sigma Fund for purported investment. The CV Chase Account also received the fraudulent conveyances of Recoverable Assets that included fictitious profits and fictitious performance rebates never earned by CV Virgil. Upon information and belief and based on documents produced to the Receiver by CV Virgil and its managing member, the individual Defendants, as either initial or subsequent transferees, then received fraudulent conveyances from the CV Chase Account.

21. The Defendants derived significant income utilizing the laws and benefits of New York and maintained minimum contacts and/or general business contacts with New York in connection with the claims alleged herein.

22. The Defendants should reasonably expect to be subject to New York jurisdiction and are subject to personal jurisdiction pursuant to New York Civil Practice Law and Rules ("CPLR") § 302.

23. Upon information and belief, Defendants Joshua Gibson and Raj Patel each maintain a home address in New York and are, therefore, subject to personal jurisdiction pursuant to New York CPLR § 301.

24. Venue in this district is proper for any claims brought by the Receiver pursuant to 28 U.S.C. § 754, and 28 U.S.C. § 1391.

## **RELEVANT ENTITY**

25. CV Virgil was a limited liability company formed under the laws of the state of Delaware with its principal place of business located in Brooklyn, New York. Between March 2018 and January 2020, CV Virgil was a limited partner in Sigma Fund. According to the Account Agreements, the mailing address for CV Virgil was reported as Brooklyn, New York.

26.     CV Virgil was the initial recipient of fraudulent conveyances from Sigma Fund.

27.     Alternatively, upon information and belief, CV Virgil was a mere conduit for the fraudulent conveyances made to the individual Defendants listed below.

## **DEFENDANTS**

28.     The Defendants received fraudulent conveyances from Sigma Fund, either as initial or subsequent transferees.

29.     Upon information and belief, Defendant Vatsal Doshi is a resident of New Jersey and was a member and beneficial owner of CV Virgil. Doshi received initial transfers and/or subsequent transfers of initial transfers from the Receivership Entities in connection with the CV Sigma Account.

30.     Upon information and belief, Defendant Joshua Gibson is a resident of New York and was a member and beneficial owner of CV Virgil. Gibson received initial transfers and/or subsequent transfers of initial transfers from the Receivership Entities in connection with the CV Sigma Account.

31.     Upon information and belief, Defendant Jasveer Grewal is a resident of Indiana and was a member and beneficial owner of CV Virgil. Grewal received initial transfers and/or subsequent transfers of initial transfers from the Receivership Entities in connection with the CV Sigma Account.

32.     Upon information and belief, Defendant Chirag Parghi is a resident of Texas and was a member and beneficial owner of CV Virgil. Parghi received initial transfers and/or subsequent transfers of initial transfers from the Receivership Entities in connection with the CV Sigma Account.

33.     Upon information and belief, Defendant Jay Patel is a resident of Pennsylvania and was a member and beneficial owner of CV Virgil. Jay Patel received initial transfers and/or

subsequent transfers of initial transfers from the Receivership Entities in connection with the CV Sigma Account.

34.     Upon information and belief, Defendant Trustee for the Kartik Patel Revocable Living Trust maintains its principal place of business in New Jersey and was a member and beneficial owner of CV Virgil. Trustee for the Kartik Patel Revocable Living Trust received initial transfers and/or subsequent transfers of initial transfers from the Receivership Entities in connection with the CV Sigma Account.

35.     Upon information and belief, Defendant Raj Patel is a resident of New York and was the managing member of CV Virgil and a beneficial owner of RP Family Holdings LLC. Raj Patel received subsequent transfers of initial transfers from the Receivership Entities in connection with the CV Sigma Account.

36.     Upon information and belief, Defendant RP Family Holdings LLC is a limited liability company domiciled in New Jersey that maintains its principal place of business in New York and was a member and beneficial owner of CV Virgil. RP Family Holdings received initial transfers and/or subsequent transfers of initial transfers from the Receivership Entities in connection with the CV Sigma Account.

37.     Upon information and belief, Defendant Sachin Patel is a resident of Pennsylvania and was a member and beneficial owner of CV Virgil. Sachin Patel received initial transfers and/or subsequent transfers of initial transfers from the Receivership Entities in connection with the CV Sigma Account.

38.     Upon information and belief, Defendant Samir R. Patel is a resident of Iowa and was a member and beneficial owner of CV Virgil. Samir R. Patel received initial transfers and/or

subsequent transfers of initial transfers from the Receivership Entities in connection with the CV Sigma Account.

39.     Upon information and belief, Defendant Varun Verma is a resident of Canada, but at the time of the initial investment into Sigma Fund was a resident of New York and was a member and beneficial owner of CV Virgil. Verma received initial transfers and/or subsequent transfers of initial transfers from the Receivership Entities in connection with the CV Sigma Account.

## RECEIVER'S STANDING

40.     The Receiver has standing to pursue the claims herein because the fraudulent conveyances received by Defendants constitute Recoverable Assets, which, under the Receiver Order, the Receiver has a duty to recover, marshal, and preserve for eventual distribution to the investors and creditors defrauded by Qin, and the recovery of such Assets is necessary for the Receiver to discharge his duties (§ I.7.I.).

41.     The Receiver has standing under the Receiver Order § I.7.E to bring claims that the Receivership Entities could have brought on their own behalf. As alleged herein, Qin freely commingled assets among and between Sigma Fund and the Receivership Entities such that the Receivership Entities and Sigma Fund are creditors of one another.

42.     The Receiver has standing under the Receiver Order § I.7.G. to bring claims that are necessary to preserve Receivership Property. As alleged herein, Defendants received assets that constitute Receivership Property.

43.     The Receiver will be unable to fully satisfy all claims made against the Receivership Entities.

44.     The Receiver has standing to bring claims pursuant to N.Y. DCL § 270 *et seq*. and New York common law.

45.     Accordingly, the Receiver has standing to bring claims to recover the fraudulent conveyances received by the Defendants.

## FACTUAL ALLEGATIONS

**The Fraudulent Ponzi Scheme**

46.     The Ponzi scheme at the center of this action involves the misappropriation and misuse of Sigma Fund investor dollars by Qin and the Receivership Entities.

47.     In June 2017, Qin launched the Virgil Capital Crypto-Fund, LP ("Virgil Crypto Fund"), the predecessor to Sigma Fund. Marketing materials for Virgil Crypto Fund asserted a very profitable, low risk investment opportunity through a "market-neutral algorithmic arbitrage strategy," which allegedly operated across tens of exchanges and traded multiple major cryptocurrencies.

48.     Qin exercised sole day-to-day control over the operations, accounts, and assets of Virgil Crypto Fund and its general partner, Virgil Capital Pty Ltd. ("Virgil Pty"). Instead of deploying the investor assets into the arbitrage trading strategy as represented, Qin misappropriated the money, diverting funds to accounts registered in his personal name and capacity which, among other things, he used to pay for rebate and redemption payments to other Virgil Crypto Fund investors, as well as rebate and redemption payments to investors in the subsequently established Sigma Fund. To conceal his Ponzi scheme, Qin fabricated and issued monthly account statements to investors leading them to falsely believe they were earning significant profits in their accounts.

49.     In April 2018, Qin expanded his fraudulent enterprise by launching Sigma Fund, which had managerial offices in California and New York. All existing Virgil Crypto Fund investors transitioned to become investors in the newly established Sigma Fund (along with the fictitious profits credited to their respective accounts).

50.     To effect this transition, Qin executed trading and agency appointment agreements between Virgil Pty and Sigma Fund's general partner, Virgil Capital, and continued to accept investor assets through Virgil Pty on Sigma Fund's behalf. By executing paper-only transfers between the fund entities, Qin did not return investor money and was able to conceal the fact that the Virgil Crypto Fund did not trade or earn legitimate gains. Qin then continued his Ponzi scheme and illegal activities in Sigma Fund. Sigma Fund inherited Virgil Crypto Fund's fraudulent books during the paper-only transition, and, as a result, Sigma Fund was insolvent from inception.

51.     As with Virgil Crypto Fund, Qin exercised control over the operations and assets of the Sigma Fund by acting as the sole member and managing member of Sigma Fund's general partner (Virgil Capital) and its investment manager (Montgomery Technologies).

52.     Although Sigma Fund was marketed to investors as an investment fund that used a proprietary, market-neutral, cryptocurrency arbitrage strategy to trade on dozens of digital asset platforms around the world to achieve positive returns every month, Sigma Fund did not conduct the trading as represented to investors, and the positive returns that investors saw on their monthly statements were entirely fabricated by Qin. Any monies, rebates or distributions investors received were nothing more than fictitious profits, which were paid from cash deposited by other Sigma Fund investors. Qin played a shell game with investor funds, moving monies among Receivership Entities, bank accounts he controlled, and Sigma Fund investors, creating a pervasive commingling of funds and presenting a false public appearance of profitability and positive investment returns – all in an effort to conceal his scheme, defraud creditors, and prolong his fraud.

53.     Investors deposited cash or cryptocurrency for purported investment into Sigma Fund into accounts owned and/or controlled by Qin, but registered in the name of Virgil Pty, Virgil

Capital, and Sigma Fund at various banks or via wallet addresses[2] owned by Qin (collectively, "Sigma Deposit Accounts"). Investor deposits into Sigma Deposit Accounts were then diverted to Qin's personal accounts, to bank accounts of other Receivership Entities under Qin's control, or kept in the Sigma Deposit Accounts and used by Qin to pay fictitious gains and profits labeled as redemptions and "performance fee rebates" to other Sigma Fund investors.

54.     As a result of Qin's fraud, as of April 1, 2018, the day on which Virgil Crypto Fund transitioned to Sigma Fund, Sigma Fund was already insolvent. Cash deposits from Sigma Fund investors for purported investment into the Fund — which included assets from Virgil Crypto Fund investors that were transferred, on paper, to Sigma Fund — totaled approximately $13.65 million. However, due to Qin's misappropriation of investor assets, as of April 1, 2018, only approximately $9.5 million remained in the Sigma Deposit Accounts. According to investor statements issued as of March 31, 2018, Sigma Fund led investors to believe that it had generated returns totaling $18.3 million in the aggregate. Thus, on day one of the Sigma Fund, the deficit between what Qin told investors they had earned in their accounts ($18.3 million) and the cash he had available to pay those earnings ($9.5 million) was almost $9 million.

55.     Qin's lack of trading or other legitimate activity that could generate revenue, along with his continued misappropriation of investor assets, Ponzi payments, and production of falsified investor records, resulted in substantial liabilities for the Sigma Fund. These liabilities grew increasingly worse over the next two years of the fraud as additional money was raised, and then stolen, from investors.

56.     By December 2020, when the SEC Action was commenced, Sigma Fund had less than $8,000 in its bank accounts, but fabricated investor account statements issued the month prior

---

[2] A wallet address is an alphanumeric string from and to which cryptocurrencies can be sent.

reflected a total of nearly $111 million purportedly held by investors in Sigma Fund. The deficit between what Qin told investors they had earned and the cash he had available to pay was more than $110 million.

57.     The payments made to Sigma Fund investors, including to the Defendants herein, were necessary to maintain the Ponzi scheme, to avoid detection of the fraud, to give the appearance of profitability in the Sigma Fund, to lure new investors into the scheme, and to make it appear to older investors that real trading gains had been earned in their accounts.

58.     At all times relevant hereto, the Receivership Entities and the Sigma Fund were insolvent in that (i) their assets were worth less than the value of their liabilities; (ii) they could not meet obligations as they became due; and (iii) at the time of the transfers in question, the Receivership Entities and the Sigma Fund were left with insufficient capital.

**Investments and the Transfers**

*Deposits to the Virgil Crypto and Sigma Funds*

59.     Defendant RP Family Holdings, LLC was an investor in Virgil Crypto Fund. Between December 2017 and January 2018, RP Family Holdings transferred a total of approximately $35,551.70 to Sigma Deposit Accounts for purported investment in the Virgil Crypto Fund in an account under its name ("RP Family Virgil Crypto Account"), as set forth in detail below. *See* rows 3 & 4 under "Deposits" in Exhibit A annexed hereto.

60.     In or around December 19, 2017, RP Family Holdings wired $25,000 to a Sigma Deposit Account for purported investment in the RP Family Virgil Crypto Account.

61.     In or around January 26, 2018, RP Family Holdings transferred 10 ether ("ETH") (valued at the time at approximately $10,551.70) to a Sigma Deposit Account for purported investment in the RP Family Virgil Crypto Account.

62.     In or around March 2018, RP Family Holdings became a member of CV Virgil. Upon instruction from Raj Patel, the beneficial owner of RP Family Holdings and managing member of CV Virgil, the balance in the RP Family Virgil Crypto Account, including fictitious profits, was transferred to the CV Sigma Account.

63.     Between April and September 2018, CV Virgil, through its managing member Raj Patel, wired a total of $1,394,443.88 from the CV Chase Account to Sigma Deposit Accounts for purported investment in the CV Sigma Account, as set forth in detail below. *See* rows 5-8 under "Deposits" in Exhibit A.

64.     More specifically, in or around April 3, 2018, CV Virgil, through its managing member Raj Patel, wired $944,491.98 from the CV Chase Account to a Sigma Deposit Account for purported investment in the CV Sigma Account. Upon information and belief and based on documents produced to the Receiver by CV Virgil and its managing member, the monies deposited were pooled from the individual Defendants for purposes of investing in Sigma Fund.

65.     In or around July 2, 2018, CV Virgil, through its managing member, wired $99,982.25 to a Sigma Deposit Account for purported investment in the CV Sigma Account. Upon information and belief and based on documents produced to the Receiver by CV Virgil and its managing member, these funds were pooled from the individual Defendants for purposes of investing in Sigma Fund.

66.     In or around July 20, 2018, CV Virgil, through its managing member, wired $199,982.27 to a Sigma Deposit Account for purported investment in the CV Sigma Account. Upon information and belief and based on documents produced to the Receiver by CV Virgil and its managing member, these funds were pooled from the individual Defendants for purposes of investing in Sigma Fund.

67.    In or around September 27, 2018, CV Virgil, through its managing member, wired $149,987.38 to a Sigma Deposit Account for purported investment in the CV Sigma Account. Upon information and belief and based on documents produced to the Receiver by CV Virgil and its managing member, these funds were pooled from the individual Defendants for purposes of investing in Sigma Fund.

*Withdrawals and Rebates Received from Sigma Fund*

68.    Between July 6, 2018 and January 31, 2020, in connection with so-called performance fee rebates and redemption requests made by CV Virgil, Qin transferred approximately $2,716,182.27 from the Sigma Deposit Accounts to the CV Chase Account. *See* "Withdrawals" in <u>Exhibit A</u>.

69.    Of the $2,716,182.27 total transferred from Qin to the CV Chase Account, $1,286,186.69 ("Transfers") constituted fictitious "profits" or fictitious "performance fee rebates" that were purportedly earned through Sigma Fund's arbitrage investment strategy. However, as Sigma Fund operated as a Ponzi scheme, and no actual trading occurred on behalf or for the benefit of Sigma Fund investors, including CV Virgil, the Transfers actually consisted of other Sigma Fund investors' money.

70.    Upon information and belief and based on documents produced to the Receiver by CV Virgil and its managing member Raj Patel, the Transfers were made for the benefit of each of the Defendants. The Transfers are avoidable and recoverable under the applicable provisions of N.Y. CPLR § 203(g) and N.Y. DCL §§ 273-279.

71.    Upon information and belief, the Transfers were initially received by CV Virgil and thereafter transferred by CV Virgil to the Defendants.

72.     Based upon documents provided by CV Virgil to the Receiver, between 2019 and February 2020 Defendant Vatsal Doshi received approximately $354,580.18 in Transfers.

73.     Based upon documents provided by CV Virgil to the Receiver, in 2019, Defendant Joshua Gibson received approximately $909.98 in Transfers.

74.     Based upon documents provided by CV Virgil to the Receiver, between 2019 and February 2020 Defendant Jasveer Grewal received approximately $47,342.83 in Transfers.

75.     Based upon documents provided by CV Virgil to the Receiver, between 2019 and February 2020 Defendant Chirag Patel received approximately $23,671.41 in Transfers.

76.     Based upon documents provided by CV Virgil to the Receiver, between 2019 and February 2020 Defendant Trustee for the Kartik Patel Revocable Living Trust received approximately $165,660.73 in Transfers.

77.     Based upon documents provided by CV Virgil to the Receiver, between 2018 and February 2020 Defendant Raj Patel received approximately $104,293.20 in Transfers.

78.     Based upon documents provided by CV Virgil to the Receiver, between 2019 and February 2020 Defendant RP Family Holdings, LLC received approximately $43,192.97 in Transfers.

79.     Based upon documents provided by CV Virgil to the Receiver, between 2019 and February 2020 Defendant Jay Patel received approximately $45,459.53 in Transfers.

80.     Based upon documents provided by CV Virgil to the Receiver, between 2019 and February 2020 Defendant Sachin Patel received approximately $327,760.58 in Transfers.

81.     Based upon documents provided by CV Virgil to the Receiver, between 2019 and February 2020 Defendant Samir Patel received approximately $84,327.54 in Transfers.

82. Based upon documents provided by CV Virgil to the Receiver, in 2019 Defendant Varun Verma received approximately $20,141.83 in Transfers.

83. In addition to the Transfers detailed in paragraphs 72 through 82 above, based upon documents provided by CV Virgil to the Receiver, between 2018 and January 2020, CV Virgil and its managing member were also recipients of fictitious rebates in the amount of approximately $134,257.33 in Transfers. Upon information and belief, the fictitious rebates were then transferred to defendant RP Family Holdings and/or defendant Raj Patel, or, in the alternative, were shared with the other Defendants.

84. Defendants are either initial transferees or subsequent transferees of the Transfers.

85. The Transfers, or the value thereof, are recoverable from the Defendants.

86. As the Receiver's investigation is ongoing, the Receiver reserves the right to (i) supplement the information regarding the Transfers, including any additional transfers and (ii) seek recovery of such additional transfers.

87. To the extent that any of the avoidance and/or recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

## <u>COUNT ONE</u>
## FRAUDULENT CONVEYANCE MADE WITH INTENT TO DEFRAUD – NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 278 AND/OR 279

88. The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

89. Each of the Transfers constituted a conveyance as defined under N.Y. DCL § 270.

90. Each of the Transfers was made (i) with the actual intent to hinder, delay, or defraud the present and future creditors of the Receivership Entities, and (ii) to or for the benefit of Defendants in furtherance of a fraudulent scheme.

91.     As a result of the foregoing, pursuant to N.Y. DCL §§ 276, 278, and/or 279, the Receiver is entitled to a judgment against Defendants that (i) directs that the Transfers be set aside; and (ii) recovers the Transfers or the value thereof, from Defendants for the benefit of the Receivership Estates.

**COUNT TWO**
**FRAUDULENT CONVEYANCE BY INSOLVENT – NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278 AND/OR 279**

92.     The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

93.     Each of the Transfers constituted a conveyance by the Receivership Entities as defined under N.Y. DCL § 270.

94.     The Receivership Entities did not receive fair consideration for any of the Transfers.

95.     The Receivership Entities were insolvent, or became insolvent, as a result of the Transfers.

96.     As a result of the foregoing, pursuant to N.Y. DCL §§ 273 278, and/or 279, the Receiver is entitled to a judgment against Defendants that (i) directs that the Transfers be set aside; and (ii) recovers the Transfers, or the value thereof, from Defendants for the benefit of the Receivership Estates.

**COUNT THREE**
**FRAUDULENT CONVEYANCE BY PERSONS IN BUSINESS – NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278 AND/OR 279**

97.     The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

98.     Each of the Transfers constituted a conveyance by the Receivership Entities as defined under N.Y. DCL § 270.

99.     The Receivership Entities did not receive fair consideration for any of the Transfers.

100.     At the time the Receivership Entities made each of the Transfers, they were engaged or were about to engage in a business or transaction for which the property remaining in its hands after each of the Transfers was an unreasonably small amount of capital.

101.     As a result of the foregoing, pursuant to N.Y. DCL §§ 274, 278, and/or 279, the Receiver is entitled to a judgment against Defendants that (i) directs that the Transfers be set aside; and (ii) recovers the Transfers or the value thereof, from Defendants for the benefit of the Receivership Estates.

**COUNT FOUR**
**FRAUDULENT CONVEYANCE BY A PERSON ABOUT TO INCUR DEBTS – NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278 AND/OR 279**

102.     The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

103.     Each of the Transfers constituted a conveyance by the Receivership Entities as defined under N.Y. DCL § 270.

104.     The Receivership Entities did not receive fair consideration for any of the Transfers.

105.     At the time the Receivership Entities made each of the Transfers, they had incurred, were intending to incur, or believed that they would incur, debts beyond their ability to pay them as the debts matured.

106.     As a result of the foregoing, pursuant to N.Y. DCL §§ 275 278, and/or 279, the Receiver is entitled to a judgment against Defendants that (i) directs that the Transfers be set aside; and (ii) recovers the Transfers, or the value thereof, from Defendants for the benefit of the Receivership Estates.

## COUNT FIVE
## RECOVERY OF SUBSEQUENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§ 278 AND/OR 279

107.    The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as though fully set forth herein.

108.    Each of the Transfers is avoidable under N.Y. DCL §§ 273, 274, 275, and/or 276.

109.    Upon information and belief, the Transfers were subsequently conveyed by CV Virgil to the individual Defendants.

110.    Each of the Transfers was made directly or indirectly to the Defendants.

111.    The Defendants are each an immediate or mediate transferee of the Transfers through CV Virgil.

112.    As a result of the foregoing and the avoidance of the within Transfers, pursuant to N.Y. DCL §§ 278 and/or 279, the Receiver is entitled to judgment against the Defendants that (i) directs that the Transfers be set aside; and (ii) recovers the Transfers, or the value thereof, from Defendants for the benefit of the Receivership Estates.

## COUNT SIX
## UNJUST ENRICHMENT

113.    The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as though fully set forth herein.

114.    The Defendants each benefited from the receipt of money from the Receivership Entities in the form of the Transfers alleged herein, which are Recoverable Assets, and for which the Defendants did not adequately compensate the Receivership Entities or provide value.

115.    The Defendants have unjustly failed to repay the Receivership Entities for the benefits they received from the Transfers.

116. The enrichment was at the expense of the Receivership Entities and, ultimately, at the expense of the Receivership Estates' investors and creditors.

117. Equity and good conscience require full restitution of the Transfers received by Defendants from the Receivership Entities for distribution to the Receivership Estates' investors and creditors.

118. By reason of the above, the Receiver, on behalf of the Receivership Estates and their investors and creditors, is entitled to an award in an amount to be determined at trial.

**COUNT SEVEN**
**CONVERSION**

119. The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as though fully set forth herein.

120. The Receiver has a possessory right and interest in the Transfers.

121. The Defendants have wrongfully exercised dominion over the Transfers, and have interfered with the Receiver's rights and interests to the Transfers, in derogation of the Receiver's rights.

122. On or about December 21, 2021, the Receiver served a subpoena directed to CV Virgil upon its former managing member commanding the production of information, including identification of the receipt of any rebate, redemption, withdrawal, payment, or transfer of any kind from the Receivership Entities.

123. Between approximately March 21, 2022 and March 24, 2022, the Receiver served subpoenas upon Chirag Parghi, Jasveer Grewal, Jay Patel, Kartik Patel Revocable Living Trust Agreement dated 4/23/2013, Sachin Patel, Samir R. Patel, Vatsal Doshi, RP Family Holdings, Inc. and Raj Patel commanding the production of information, including identification of the receipt of

any rebate, redemption, interest payment, withdrawal, distribution or transfer of any kind from CV Virgil.

124.    On or about July 12, 2022, the Receiver sent a demand letter to Defendants through counsel, describing in detail $1,286,136 in transfers and how much the Receiver determined was received by each of Sachin Patel, Vatsal Doshi, Raj Patel, Kartik Patel Revocable Living Trust Agreement dated 4/23/2013, Samir R. Patel, Jasveer ("Jerry") Grewal, Jay Patel, Chirag Parghi, Varun Verma, and Joshua Gibson.  The July 12, 2022 demand letter attached the Receiver Order, describing the Receiver's rights to the Transfers and the duties of the recipients of that Order.

125.    The Defendants have wrongfully refused to return the Transfers to the Receiver and have instead wrongfully detained those funds.

126.    By reason of the above, the Receiver, on behalf of the Receivership Estates and their investors and creditors, is entitled to an award of damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, the Receiver respectfully requests that this Court enter judgment in favor of the Receiver and against Defendants as follows:

i.    On the First Claim for Relief, pursuant to N.Y. DCL §§ 276, 278 and/or 279, (a) directing that the Transfers be set aside; and (b) recovering the Transfers, or the value thereof, from Defendants for the benefit of the Receivership Estates;

ii.    On the Second Claim for Relief, pursuant to N.Y. DCL §§ 273, 278 and/or 279, (a) directing that the Transfers be set aside; and (b) recovering the Transfers or the value thereof, from Defendants for the benefit of the Receivership Estates;

iii.     On the Third Claim for Relief, pursuant to N.Y. DCL §§ 274, 278 and/or 279, (a) directing that the Transfers be set aside; and (b) recovering the Transfers, or the value thereof, from Defendants for the benefit of the Receivership Estates;

iv.     On the Fourth Claim for Relief, pursuant to N.Y. DCL §§ 275, 278 and/or 279, (a) directing that the Transfers be set aside; and (b) recovering the Transfers or the value thereof, from Defendants for the benefit of the Receivership Estates;

v.     On the Fifth Claim for Relief, as a result of the avoidance of the Transfers, pursuant to N.Y. DCL §§ 278 and/or 279, (a) directing that the Transfers be set aside; and (b) recovering the Transfers, or the value thereof, from Defendants for the benefit of the Receivership Estates;

vi.     On the Sixth Claim for Relief for unjust enrichment, awarding damages in an amount to be determined at trial;

vii.     On the Seventh Claim for Relief for conversion, awarding damages in an amount to be determined at trial;

viii.     On all Claims for Relief, pursuant to federal common law and N.Y. CPLR §§ 5001 and 5004, awarding the Receiver prejudgment interest from the date on which the Transfers were received; and

ix.     On all Claims for Relief, awarding the Receiver all applicable interest, costs, and disbursements of this action; and

x.      On all Claims for Relief, granting the Receiver such other and further relief as the Court deems just, proper, and equitable.

Dated:  New York, New York
       January 22, 2025

               LAW OFFICE OF DENNIS O. COHEN, PLLC

By: _____
                 Dennis O. Cohen
                 157 13th Street
                 Brooklyn, NY 11215
                 (646) 859-8855
                 dennis@denniscohenlaw.com

                 *Attorney for Plaintiff Robert A. Musiala, Jr. as*
                 *Court-Appointed Receiver*

# EXHIBIT A

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | **DEPOSITS** | | | | | | |
| 2 | **DATE** | **SENDING PARTY** | **SENDING ACCOUNT** | **RECEIVING PARTY** | **RECEIVING ACCOUNT** | **PURPOSE** | **AMOUNT** |
| 3 | 12/19/2017 | RP Family Holdings LLC | N/A | Virgil Capital Pty Ltd | Virgil TW | Virgil Crypto Fund Investment | $ 25,000.00 |
| 4 | 1/26/2018 | RP Family Holdings LLC | N/A | Virgil Capital Pty Ltd (via Qin unhosted wallet) | N/A | Virgil Crypto Fund Investment | $ 10,551.70 |
| 5 | 4/3/2018 | CV Virgil LLC | CV Chase Acct | Virgil Capital Pty Ltd | Virgil CBA x0146 | Sigma Fund Investment | $ 944,491.98 |
| 6 | 7/2/2018 | CV Virgil LLC | CV Chase Acct | Virgil Capital Pty Ltd | Virgil CBA x0146 | Sigma Fund Investment | $ 99,982.25 |
| 7 | 7/20/2018 | CV Virgil LLC | CV Chase Acct | Virgil Capital Pty Ltd | Virgil CBA x0146 | Sigma Fund Investment | $ 199,982.27 |
| 8 | 9/27/2018 | CV Virgil LLC | CV Chase Acct | Virgil Capital Pty Ltd | Virgil CBA x0146 | Sigma Fund Investment | $ 149,987.38 |
| 9 | | | | | | | |
| 10 | | | | | Total: | | $ 1,429,995.58 |
| 11 | | | | | | | |
| 12 | | | | | | | |
| 13 | | | | | | | |
| 14 | **WITHDRAWALS** | | | | | | |
| 15 | **DATE** | **SENDING PARTY** | **SENDING ACCOUNT** | **RECEIVING PARTY** | **RECEIVING ACCOUNT** | **PURPOSE** | **AMOUNT** |
| 16 | 7/6/2018 | Virgil Capital Pty Ltd. | Virgil CBA x0146 | CV Virgil LLC | CV Chase Acct | Rebate | $ (29,964.13) |
| 17 | 11/13/2018 | Virgil Capital Pty Ltd. | Virgil CBA x0146 | CV Virgil LLC | CV Chase Acct | Rebate | $ (21,212.80) |
| 18 | 1/23/2019 | Virgil Sigma Fund, LP | Virgil SG x7013 | CV Virgil LLC | CV Chase Acct | Rebate | $ (30,010.00) |
| 19 | 4/26/2019 | Virgil Sigma Fund, LP | Virgil SG x7013 | CV Virgil LLC | CV Chase Acct | Withdrawal | $ (227,009.95) |
| 20 | 5/1/2019 | Virgil Sigma Fund, LP | Virgil SG x7013 | CV Virgil LLC | CV Chase Acct | Withdrawal | $ (94,855.61) |
| 21 | 5/20/2019 | Virgil Capital Pty Ltd. | Virgil CBA x0146 | CV Virgil LLC | CV Chase Acct | Rebate | $ (15,000.00) |
| 22 | 8/1/2019 | Virgil Sigma Fund, LP | Virgil SG x7013 | CV Virgil LLC | CV Chase Acct | Rebate | $ (22,968.40) |
| 23 | 10/24/2019 | Virgil Capital LLC | Virgil SG x7005 | CV Virgil LLC | CV Chase Acct | Rebate | $ (10,553.88) |
| 24 | 11/6/2019 | Virgil Sigma Fund, LP | Virgil SG x7013 | CV Virgil LLC | CV Chase Acct | Withdrawal | $ (1,400,000.00) |
| 25 | 1/30/2020 | Virgil Capital LLC | Virgil SG x7005 | CV Virgil LLC | CV Chase Acct | Rebate | $ (2,732.76) |
| 26 | 1/31/2020 | Virgil Capital LLC | Virgil SG x7005 | CV Virgil LLC | CV Chase Acct | Rebate | $ (1,815.76) |
| 27 | 1/31/2020 | Virgil Sigma Fund, LP | Virgil SG x7013 | CV Virgil LLC | CV Chase Acct | Withdrawal | $ (860,058.98) |
| 28 | | | | | | | |
| 29 | | | | | Total: | | $ (2,716,182.27) |